UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NICHOLAS DeSANTIS,

                    Plaintiff,

          v.                                              **DECISION AND ORDER**
                                                          17-CV-148S

TOWN OF CHEEKTOWAGA,
TOWN OF CHEEKTOWAGA POLICE OFFICER GRAY,
TOWN OF CHEEKTOWAGA POLICE OFFICER DeVINCENTIS,
TOWN OF CHEEKTOWAGA POLICE OFFICER FILIPSKI,
TOWN OF CHEEKTOWAGA POLICE SUPERVISOR SCHMIDT,
ANDREA CULP, and LEE CULP,

                    Defendants.


# I. INTRODUCTION

In this action, Plaintiff Nicholas DeSantis alleges that the defendants violated his

constitutional rights during and subsequent to a child-custody exchange that occurred in

2014 at his residence in Cheektowaga, New York.   Presently before this Court are the

defendants' motions for summary judgment.   (Docket Nos. 21, 23.)   For the reasons that

follow, this Court finds that the defendants are entitled to summary judgment on all causes

of action against them except for DeSantis's claim that Defendant Officer DeVincentis

entered his apartment in violation of his Fourth Amendment rights.   Consequently,

Defendants Andrea and Lee Culp's motion for summary judgment will be granted in its

entirety, and Defendant Officer DeVincentis's motion for summary judgment will be

granted in part and denied in part.[1]

---

[1] The Town of Cheektowaga defendants filed a collective motion for summary judgment that, for ease of
reference, this Court will refer to as Officer DeVincentis's motion.   (Docket No. 23.)   DeSantis does not
contest the entry of summary judgment in favor of the Town of Cheektowaga, Town of Cheektowaga Police

1

## II. BACKGROUND

On February 16, 2014, law enforcement responded to a call for assistance in a child-custody exchange between DeSantis and Andrea Culp. DeSantis, who failed to respond to numerous attempts to contact him, was eventually found passed out drunk in his residence after members of Andrea's family and Defendant Officer DeVincentis entered his residence.[2] This incident played prominently in a subsequent family court proceeding between DeSantis and Andrea, resulting in testimony there that differs from testimony provided here. But aside from those differing versions, the majority of the facts are undisputed.

### A. Facts

#### 1. The relationship between DeSantis and the Culps

DeSantis and Andrea Culp are the biological parents of M.D., a minor born in 2008. (DeVincentis's Rule 56 Statement of Facts ("DeVincentis's Statement"), Docket No. 23-1, ¶ 1.[3]) DeSantis and Andrea lived together raising M.D. until their relationship ended in 2009. (Id. ¶ 2.) Andrea later married Defendant Lee Culp, M.D.'s stepfather, on December 1, 2013. (Id. ¶ 6; Family Court Testimony of Lee Culp, Docket No. 29-1, pp. 168-69.)

---

Officer Gray, Town of Cheektowaga Police Officer Filipski, or Town of Cheektowaga Police Officer Schmidt. (Memorandum of Law, Docket No. 29, p. 1.) Accordingly, they are entitled to summary judgment and will not be discussed herein.

2 DeSantis admits that he was intoxicated on the night in question. (Culps' Statement Pursuant to Rule 56 (a)(1), Docket No. 21-1, ¶ 1; DeSantis's Statement Pursuant to Rule 56 (a)(2), Docket No. 28-8, ¶ 1.)

3 Because DeSantis admits most of the facts in Defendant Officer DeVincentis's Statement, see Plaintiff's Statement Pursuant to FRCP 56 (a)(2) ("Plaintiff's Statement"), Docket No. 29-7, this Court will cite DeSantis's competing statement only when there is a disputed issue of fact.

Shortly after their relationship ended, DeSantis and Andrea Culp entered a custody agreement that provided Andrea residential custody of M.D., with DeSantis entitled to weekly, overnight, and holiday visitation pursuant to a set schedule. (DeVincentis's Statement, ¶ 7.) As relevant here, DeSantis had custody of M.D. on alternate weekends from after school Friday until 8:00 p.m. Sunday, at which time Andrea would pick up M.D. from DeSantis's residence. (Id. ¶¶ 8-11.)

DeSantis resided in the upper apartment of a duplex on Cavalier Drive in Cheektowaga. (Id. ¶¶ 3, 4.) Entry to the duplex was through a side exterior door, which led to a common stairway shared by the lower and upper apartments. (Id. ¶ 5.) A door at the top of the stairs led directly into DeSantis's apartment. (Id.)

At the appointed time on alternate Sunday nights, Andrea Culp would drive to DeSantis's residence and notify him when she had arrived. (Id. ¶ 10.) Andrea would then wait for M.D. outside the exterior door until DeSantis brought M.D. down for the exchange of custody. (Id. ¶¶ 9, 10.) The two parents never had any issues concerning the transfer of custody in this way before Sunday, February 16, 2014. (Id. ¶ 10.)

**2. The custody exchange on February 16, 2014**

DeSantis had custody of then five-year-old M.D. on Sunday, February 16, 2014. (Id. ¶¶ 12, 13.) That day, DeSantis and M.D. went out to breakfast and shopped and then had two of DeSantis's friends over to listen to music, dance, socialize, and have a good time. (Id. ¶ 14; Deposition of Nicholas DeSantis ("DeSantis Dep."), Docket No. 29-5, p. 16.) But at some point during the day, DeSantis, who had a drinking problem, became intoxicated. (DeVincentis's Statement, ¶¶ 15, 16.) DeSantis does not know

when he started drinking or how much alcohol he consumed.   (Id. ¶ 16; DeSantis Dep., p. 17.)   After their guests left, M.D. and an intoxicated DeSantis played cards and "hung out" until about 7:00 p.m., when they watched a movie until they both fell asleep sometime before 8:00 p.m.   (DeVincentis's Statement, ¶ 17; DeSantis Dep., p. 17.)

Meanwhile, the Culps arrived at DeSantis's residence around 7:55 p.m. to pick up M.D. as usual.   (DeVincentis's Statement, ¶ 19.)   DeSantis's vehicle was in the driveway and the lights in his apartment were on.   (Id. ¶ 20.)   Andrea Culp sent DeSantis a text message that she had arrived, but received no response.   (Id. ¶ 21.)   She waited until 8:00 p.m. and then phoned DeSantis several times, but he did not answer.   (Id. ¶ 22.)   Andrea then began knocking on the exterior side door until a child who resided in the lower apartment answered at approximately 8:15 p.m.   (Id. ¶ 23.)   Andrea explained who she was and asked the child to go upstairs and knock on DeSantis's door.   (Id.)   Still no answer.   (Id.)

Continuing her efforts to reach DeSantis, Andrea Culp called DeSantis's mother, but she too was unable to reach DeSantis by phone.   (Id. ¶ 25.)   Andrea then tried shouting M.D.'s name from the stairwell, to no avail.   (Id. ¶ 26.)   Next, Andrea turned to her own parents for assistance.   (Id. at ¶ 27.)   They arrived at DeSantis's residence at approximately 8:30 p.m. and began looking for footprints or tire tracks to determine whether DeSantis and M.D. may have left the residence.   (Id.)   At that point, DeSantis's mother called Andrea back, and Andrea told her that she was going to call 911 since her efforts to reach DeSantis were all unsuccessful.   (Id. ¶ 28.)   Andrea then called 911, resulting in Defendant Officer Anthony DeVincentis being dispatched to the scene at 8:37

p.m.  (Id. at ¶ 29.)

This is where the testimony begins to diverge.

### 3.  The Culps' family court testimony

Approximately 17 months after the night in question, both Lee Culp and Andrea Culp testified about it during a family court proceeding.  Andrea testified that before Officer DeVincentis[4] arrived, her father, Gregory Croce, went into DeSantis's apartment, got M.D., and brought M.D. out to her car.  (Family Court Testimony of Andrea Culp, Docket No. 29-2, p. 35.)  She further testified that when Officer DeVincentis arrived, he went back into the apartment with M.D. and Lee because "[DeSantis] was passed out drunk."  (Id. pp. 35, 81.)

Lee Culp testified differently.  He stated that he, Croce, and Officer DeVincentis went into DeSantis's apartment together to get M.D.  (Family Court Testimony of Lee Culp, pp. 180-81.)  On his way up to the apartment, Lee observed that M.D.'s shoes were outside the door, that the door frame was broken, and that the door was ajar.  (Id. pp. 175-76.)  Once inside, Lee saw empty beer cans, a pizza box, and garbage around.  (Id. p. 176.)

Lee next saw DeSantis and M.D. asleep together on the couch.  (Id. p. 200.)  He testified that Croce woke M.D. and then took M.D. out of the apartment.  (Id. pp. 200-01.)  Lee testified that he could smell alcohol and that DeSantis could not easily be woken.  (Id. pp. 172, 176, 180, 193, 200.)  Once woken, DeSantis could not sit up on his own and

---

4 In their family court testimony, both Lee Culp and Andrea Culp refer to "the police" generically.  It is undisputed, however, that Officer DeVincentis was the responding officer.  (DeVincentis's Statement, ¶ 39.)

had to be assisted by Officer DeVincentis.   (Id. pp. 202-03.)   According to Lee, it took 10 minutes to get DeSantis into a standing position.   (Id. p. 203.)

While in the apartment, Lee took three photographs: one of DeSantis "passed out, drunk" on the couch (id. p. 172); one of the living area (id. p. 176); and one of a clock (id. p. 180).   He testified that he took these photographs for "evidence, just in case" because DeSantis had been "threatening [he and Andrea] all weekend" that he would take M.D. away from them.   (Id. pp. 181-82, 191-92.)

### 4.  The Culps' testimony in this action

The deposition testimony in this action was given in late 2017, approximately three years after the night in question.   While Andrea Culp's deposition testimony remained fairly consistent with her family court testimony, Lee Culp's did not.

Lee Culp testified at his deposition that he and Croce went into DeSantis's apartment to get M.D. *before* Officer DeVincentis arrived, which is markedly different than his family court testimony, where he said that he and Croce went into the apartment to get M.D. *with* Officer DeVincentis.   (Id. ¶ 30; Deposition of Lee Culp ("L. Culp Dep."), Docket No. 29-4, pp. 14-16; DeVincentis's Statement, ¶ 30; Plaintiff's Statement, ¶ 30.) Lee testified that Croce sternly pressured him into accompanying him (Croce) into the apartment to get M.D., even though Lee was scared.   (L. Culp Dep., p. 14.)   Croce insisted that Lee must go in because "this is your son's life."   (Id.)   But in his family court testimony, Lee stated that Officer DeVincentis let them into the apartment, testifying "[t]hey said, come with us, and we came."   (Family Court Testimony of Lee Culp, p. 181.)

Lee Culp's deposition testimony became more consistent when he described going

into the apartment. He stated that when he and Croce reached the top of the stairs, they saw M.D.'s shoes on the landing and noticed that the door to DeSantis's apartment was ajar. (DeVincentis's Statement, ¶¶ 30, 31.) The two men shouted for DeSantis and M.D. from outside the second-floor door and then entered after there was no response. (Id. ¶¶ 32, 33; Plaintiff's Statement, ¶ 32.)

But the account diverges again upon entry into the apartment. Lee Culp testified at his deposition that he entered the apartment with Croce, and the two men saw DeSantis and M.D. laying on the couch. (DeVincentis's Statement, ¶ 33.) Neither of them moved or woke, even though Lee and Croce continued shouting as they entered the apartment. (L. Culp Dep., pp. 18-19.) Lee testified that *he* went to the couch and picked up M.D., at which point he could smell alcohol emanating from DeSantis. (Id. pp. 19-20; DeVincentis's Statement, ¶¶ 34, 35; Plaintiff's Statement, ¶ 35.) Yet in the family court proceeding, Lee testified that *Croce* woke M.D. and took M.D. out of the apartment. (Family Court Testimony of Lee Culp, pp. 200-01.) Lee further testified during his deposition that M.D. woke as Lee picked M.D up, and that other than being a little confused, M.D. was fine. (L. Culp Dep., p. 21.) According to Lee, Croce tried to wake DeSantis by shaking him, but DeSantis did not stir and remained unconscious the entire time Lee and Croce were in the apartment. (DeVincentis's Statement, ¶¶ 36-38.)

Lee Culp further testified that as he started to leave with M.D., Croce told him to stop and take pictures, which he did. (L. Culp. Dep., p. 20; DeVincentis's Statement, ¶ 35; Plaintiff's Statement, ¶ 35.) With M.D. in one arm, Lee took three pictures. (L. Culp. Dep., pp. 22, 43.) Lee testified that he and Croce then took M.D. straight to Andrea

Culp's car, *passing law enforcement along the way*, as opposed to already being with Officer DeVincentis, as Lee testified previously.   (L. Culp. Dep., pp. 21, 24; DeVincentis's Statement, ¶ 40; Plaintiff's Statement, ¶ 40.)   Lee stated that he did not stop to speak to law enforcement.   (L. Culp Dep., pp. 23-24.)

### 5.  Officer DeVincentis's testimony

Officer DeVincentis was the first police officer to arrive on the scene. (DeVincentis's Statement, ¶ 39.)   He immediately spoke to Andrea Culp, who informed him that DeSantis had a drinking problem, a history of binge drinking, and was passed out drunk and unresponsive in the apartment.   (Id. ¶¶ 41, 42; DeVincentis Dep., p. 14.) Based on this discussion, Officer DeVincentis believed that DeSantis could need medical assistance for alcohol-related distress and therefore entered DeSantis's apartment to assess his condition as part of a welfare check.   (DeVincentis's Statement, ¶ 44; DeVincentis Dep., p. 16.)   Officer DeVincentis does not recall anyone other than Andrea being outside at the scene upon his arrival.   (DeVincentis Dep., p. 10.)

Officer DeVincentis testified that as he was about to enter the duplex, Croce came down the stairs carrying M.D.   (Id. p. 12.)   He clearly remembers "the grandfather exiting with the child."   (Id.)   Officer DeVincentis does not recall whether he spoke to Croce, but recalls that M.D. was fine.   (Id. p. 13.)

Upon entering the apartment, Officer DeVincentis saw open containers of alcohol and found DeSantis unconscious on the couch.   (DeVincentis's Statement, ¶ 46.)   He does not recall anyone else entering the apartment with him and surmised that he would not have allowed any civilians to accompany him into the residence.   (DeVincentis Dep.,

pp. 17-19.)   He specifically testified that he did not recall seeing Lee Culp at the scene, speaking with him, or letting him into DeSantis's residence.   (Id. pp. 29, 43, 53.)

Officer DeVincentis roused DeSantis by yelling his name and shaking him. (DeVincentis Statement, ¶ 47.)   When DeSantis woke, he did not know what time of day it was, why M.D. was not with him, or how much time had passed since M.D. left the residence.   (Id. ¶ 50.)   Officer DeVincentis explained what was happening to DeSantis, who was cooperative and admitted to consuming alcohol, including five or six beers.   (Id. ¶¶ 51, 52; Police Report, Docket No. 23-6.)   DeSantis also consented to an Alco-Sensor test in the apartment, which indicated a blood-alcohol content of .20.   (Id.)   Officer DeVincentis then arrested DeSantis for endangering the welfare of a child, explaining that DeSantis had essentially left M.D. unattended.   (DeVincentis's Statement, ¶¶ 51, 53; DeVincentis Dep., pp. 20, 23.)

Post-arrest, Officer DeVincentis informed the prosecuting attorney that DeSantis had been cooperative and was extremely remorseful, in what appears to have been a bid for leniency.   (DeVincentis Dep., pp. 27, 31-32, 49-50.)   DeSantis pleaded guilty to the child-endangerment charge and was required to attend drug court.   (DeSantis Dep., pp. 26-27.)   He later withdrew his guilty plea, and the charge was dismissed.   (Id. pp. 27-28, 35-36, 40-41; Docket No. 29-6.)

Officer DeVincentis testified that he does not know Lee Culp or Andrea Culp, nor had he ever spoken to them before or after the night in question.   (DeVincentis Dep., pp. 53-54.)   Lee and Andrea also both testified that they did not know Officer DeVincentis and never interacted with him in any way other than on February 16, 2014.   (L. Culp

Dep., p. 39; Deposition of Andrea Culp, Docket No. 23-9, pp. 53-54.)

## B. Procedural History

DeSantis timely filed this suit under 42 U.S.C. § 1983 on February 16, 2017. (Docket No. 1.)   Defendants thereafter filed answers, and this case proceeded to discovery before the Magistrate Judge.   (Docket Nos. 7, 8, 11.)   Upon completion of discovery, Defendants Lee and Andrea Culp moved for summary judgment on June 29, 2018.   (Docket No. 21.)   Officer DeVincentis moved for summary judgment on July 3, 2018.   (Docket No. 23.)   Briefing concluded on September 25, 2018, at which time this Court took the motions under advisement without oral argument.

## III. DISCUSSION

DeSantis asserts three causes of action under 42 U.S.C. § 1983 arising from the February 16, 2014 custody exchange.   First, he claims that Andrea Culp, Lee Culp, and Officer DeVincentis violated his Fourth Amendment rights by entering his home without a warrant.   Second, he claims that Officer DeVincentis maliciously prosecuted him in violation of his Fourth Amendment rights.   Third, he claims that Officer DeVincentis violated his Fourth Amendment rights to be free from unreasonable seizure, false arrest, and false imprisonment.   The defendants seek summary judgment on each claim.[5]

---

[5] In his complaint, DeSantis contends that his claims also fall under the Fourteenth Amendment.   Such is not the case.   See Albright v. Oliver, 510 U.S. 266, 268, 274, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (rejecting a substantive right under the Fourteenth Amendment Due Process Clause to be free from criminal prosecution except upon probable cause and instead finding that the Fourth Amendment governs "the deprivations of liberty that go hand in hand with criminal prosecutions"); see also Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (holding that where a particular amendment "provides an explicit textual source of constitutional protection" against particular government behavior, "that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims").   Accordingly, any Fourteenth Amendment claims are dismissed.

## A. General Legal Principles

### 1. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful,"

D'Amico v. City of N.Y., 132 F.3d 145, 49 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

## 2. Section 1983 and Personal Involvement

DeSantis brings his claims under 42 U.S.C. § 1983. Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must establish that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); see also Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999). It is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of

damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

## B. Officer DeVincentis's Motion for Summary Judgment

DeSantis brings three Fourth Amendment claims against Officer DeVincentis: unlawful entry; malicious prosecution; and false arrest/false imprisonment. Officer DeVincentis argues that he is entitled to summary judgment on these claims because he had sufficient cause to enter DeSantis's residence to perform a welfare check and acted reasonably at all times. He also asserts that he is entitled to qualified immunity. DeSantis maintains that the existence of disputed issues of material fact precludes summary judgment in Officer DeVincentis's favor.

### 1. Officer DeVincentis is not entitled to summary judgment on DeSantis's Fourth Amendment unlawful entry claim due to the existence of disputed issues of material fact.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV. The core premise underlying this specific guarantee is that the warrantless search of a home is presumptively unreasonable. See United States v. Simmons, 661 F.3d 151, 156-57 (2d Cir. 2011) (citing Kentucky v. King, 563 U.S. 452, 459, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011)); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (noting that a "search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions." (internal quotation

and citations omitted)).   Thus, "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." Kirk v. Louisiana, 536 U.S. 635, 638, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002) (per curiam). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990).

Here, Officer DeVincentis relies on the emergency-aid exception to the Fourth Amendment warrant requirement.   "'Police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance.'" Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998) (quoting Root v. Gauper, 438 F.2d 361, 364 (8th Cir. 1971)); see Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006); Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.").   An objective standard applies to determine the reasonableness of the officer's belief.   See Mincey, 437 U.S. at 393-94.   During a warrantless entry, an officer's actions "must be strictly circumscribed by the exigencies which justify its initiation." Id. at 393.

Having considered the evidence in DeSantis's favor as required at this stage, this

Court finds that issues of disputed fact preclude summary judgment on this claim.[6] Whether Officer DeVincentis reasonably believed that DeSantis or another person in the apartment was in distress and in need of emergency assistance depends on what Officer DeVincentis knew *before* he entered the apartment without a warrant. On this question, there is competing evidence.

The version of events most favorable to DeSantis comes from Officer DeVincentis's own deposition testimony and Lee Culp's family court testimony. Officer DeVincentis testified that he did not recall seeing anyone other than Andrea Culp when he arrived at the scene. He stated that he immediately spoke to Andrea and learned that DeSantis had a drinking problem, a history of binge drinking, and was passed out drunk and unresponsive in the apartment. He further testified that before he entered the duplex, he encountered Croce bringing M.D. down the stairs, but he does not recall whether he spoke to Croce and he never saw Lee Culp. Lee Culp testified that he, Croce, and Officer DeVincentis all went into DeSantis's apartment together.

Under either of these versions, Officer DeVincentis could not have learned that DeSantis was in the apartment passed out and unresponsive because both versions have him talking to Andrea Culp *before* Andrea could have known what was actually happening in the apartment. In the first version, Officer DeVincentis spoke to Andrea before seeing Croce come down with M.D., which means that Croce could not have relayed what he

---

6 To the extent DeSantis asserts a separate § 1983 conspiracy claim against Officer DeVincentis (as opposed to using such a theory simply to bring in the Culps), this Court finds that Officer DeVincentis is entitled to summary judgment for the reasons stated in Section C of this decision: there is insufficient evidence from which a reasonable jury could find that Officer DeVincentis and the Culps agreed to inflict an unconstitutional injury on DeSantis. See Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).

saw in the apartment to Andrea before she spoke to Officer DeVincentis.   In the second version, no one had been in the apartment before Lee, Croce, and Officer DeVincentis went in, again making it impossible for Officer DeVincentis to have learned of DeSantis's condition before he entered the apartment without a warrant.   Consequently, if the jury credits either of these versions, it could find that Officer DeVincentis, knowing perhaps only that DeSantis had a history of drinking and was not responding to Andrea's attempts to contact him, lacked a reasonable basis to believe that someone in the apartment was in immediate need of assistance before entering without a warrant.   See Tierney, 133 F.3d at 196.

Of course, if the jury credits the evidence that Croce and/or Lee Culp had already been in the apartment and had reported DeSantis's condition to Andrea before she spoke with Officer DeVincentis, it could reach the opposite conclusion.   For example, Andrea testified that Croce had already retrieved M.D. before she spoke to Officer DeVincentis; Lee Culp testified at his deposition that he and Croce had retrieved M.D. before Officer DeVincentis arrived; and Officer DeVincentis testified that Andrea told him that DeSantis was unresponsive in the apartment before he entered without a warrant.   But at this stage, DeSantis is entitled to have the evidence construed in his favor.   Consequently, summary judgment on this claim is precluded due to the existence of disputed issues of material fact and open credibility determinations that only the factfinder can resolve.

These issues also preclude a pretrial determination concerning qualified immunity. The doctrine of qualified immunity protects government officials from liability for damages only if their actions violated no "clearly established constitutional rights of which a

reasonable person would have known." Allah v. Goord, 405 F. Supp. 2d 265, 272 (S.D.N.Y. 2005) (quoting Velez v. Levy, 401 F.3d 75, 100 (2d Cir. 2005)); see also Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015) ("Qualified immunity protects public officials from civil liability 'if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'") (quoting Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)); White v. Pauly, __ U.S. __, 137 S. Ct. 548, 551, 196 L Ed. 2d 463 (2017) (per curiam).

Here, the right to be free from a warrantless entry into the home to conduct a welfare check absent reasonable cause to do so was clearly established on February 16, 2014. See Tierney, 133 F.3d at 196. Thus, if DeSantis establishes that Officer DeVincentis violated this right, Officer DeVincentis is not entitled to qualified immunity. Moreover, given the unresolved issues of material fact, this Court cannot determine whether it was objectively reasonable for Officer DeVincentis to believe that his conduct did not violate any of DeSantis's rights. It therefore cannot be determined at this stage whether Officer DeVincentis is entitled to the protections of qualified immunity.

### 2. Officer DeVincentis is entitled to summary judgment on DeSantis's malicious-prosecution claim.

To prevail on a § 1983 malicious-prosecution claim, a plaintiff must demonstrate "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, and (4) actual malice." Brooks v. Whiteford, 384 F. Supp. 3d 365, 371 (W.D.N.Y. 2019); see also Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016). The plaintiff must also prove "a post-arraignment

seizure." Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013).

As it relates to the first element in claims against law enforcement officers, "[i]t is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment." Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999). Consequently, "[o]nce a criminal Defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." Williams v. City of New York, No. 02-CV-3693 (CBM), 2003 WL 22434151, at *6 (S.D.N.Y. Oct. 23, 2003) (citing Townes).

In other words, a police officer "must do more than report the crime or give testimony" to be considered to have initiated a criminal proceeding. Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010). The officer must "play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Rohman v. New York City Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000). For example, a police officer may be liable for malicious prosecution if he or she "creates false information likely to influence a jury's decision and forwards that information to prosecutors." Breton v. City of New York, 404 F. Supp. 3d 799, 812-13 (S.D.N.Y. 2019); see also Mitchell v. Victoria Home, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) ("Although there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information

18

likely to influence a jury's decision and forwards that information to prosecutors, or when she withholds relevant and material information.") (quotations and citations omitted).

As to the second element, it is satisfied only if the plaintiff proves that "the prosecution terminated in some manner indicating that the person was not guilty of the offense charged."[7] <u>Lanning v. City of Glens Falls</u>, 908 F.3d 19, 26 (2d Cir. 2018) (discussing <u>Singleton v. City of New York</u>, 632 F.2d 185, 194-95 (2d Cir. 1980)). In that regard, "a dismissal in the interest of justice [that] leaves the question of guilt or innocence unanswered . . . cannot provide the favorable termination required." <u>Id.</u> at 28-29.

Having reviewed the record evidence, this Court finds that Officer DeVincentis is entitled to summary judgment for several reasons. First, there is insufficient evidence from which a reasonable factfinder could conclude that Officer DeVincentis falsely initiated the criminal proceeding or lied or fabricated false evidence in an attempt to influence the prosecutor or factfinder. All Officer DeVincentis did was make an arrest, file a police report, and consult with the prosecutor about the case. In the absence of any further conduct on his part, Officer DeVincentis is entitled to summary judgment because the intervening acts of the prosecutor in deciding to pursue the case broke the chain of causation between the allegedly illegal arrest and the prosecution. <u>See</u> <u>Townes</u>, 176 F.3d at 147; <u>Williams</u>, 2003 WL 22434151, at *6.

Second, there is insufficient evidence from which a reasonable jury could find that

---

7 The standard for a favorable termination is different for malicious-prosecution claims brought under New York law. For purely state claims, "any termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused." <u>Cantalino v. Danner</u>, 754 N.E.2d 164 (N.Y. 2001).

the criminal proceeding resolved in DeSantis's favor. Rather, the transcript of the proceedings reveals only that the charges were dismissed on the prosecutor's motion, with no explanation why. (See Docket No. 29-6.) This is insufficient to prove the second element of DeSantis's claim. See Lanning, 908 F.3d at 28 (finding that unexplained dismissal of a criminal charge does not satisfy second element of a federal malicious-prosecution claim).

Third, for the reasons detailed at length below, undisputed facts in the record establish that there was probable cause for initiation of the criminal proceeding. DeSantis therefore cannot prove the third element of his claim.

And finally, DeSantis has failed to set forth any evidence from which a reasonable factfinder could conclude that Officer DeVincentis initiated the criminal proceeding with actual malice. In fact, the only evidence relevant to this point indicates that Officer DeVincentis may have sought leniency for DeSantis by emphasizing to the prosecutor that he had been cooperative and was extremely remorseful.

Accordingly, for the reasons stated above, this Court finds that Officer DeVincentis is entitled to summary judgment on DeSantis's malicious-prosecution claim.[8]

---

8 For the reasons discussed in Section 3, Officer DeVincentis is alternatively entitled to qualified immunity because he had at least arguable probable cause to initiate the criminal proceeding against DeSantis. See Jenkins v. City of New York, 478 F.3d 76, 86 (2d Cir. 2007) (noting that for purposes of qualified immunity, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met").

### 3. Officer DeVincentis is entitled to summary judgment on DeSantis's false arrest/false imprisonment claim.

A false arrest/false imprisonment claim is premised on the Fourth Amendment right to be free from unreasonable seizure and is analyzed the same as a claim for false arrest/false imprisonment under New York law. See Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). The two claims are essentially synonymous. See Weyant, 101 F.3d at 853 (citing Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)); Nix v. City of Rochester, No. 6:14-CV-06395 (MAT), 2017 WL 3387103, at *5 (W.D.N.Y. Aug. 5, 2017).

To succeed on a false arrest/false imprisonment claim, a plaintiff must prove that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. See Willey v. Kirkpatrick, 801 F.3d 51, 70-71 (2d Cir. 2015) (quoting Broughton v. State of New York, 335 N.Ed.2d 310, 314 (N.Y. 1975)); Nix, 2017 WL 3387103, at *5.

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015); Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); Walker v. City of New York, 15 CV 500 (NG)(ST), 2017 WL 2799159, at *3 (E.D.N.Y. June 27, 2017) ("An arrest is privileged when probable cause exists, and probable cause is, therefore, a complete defense to a claim for false arrest.") (citing Weyant).

Probable cause "is a complete defense to an action for false arrest brought under

New York law or § 1983." <u>Ackerson</u>, 702 F.3d at 19. A finding of probable cause is made based on the totality of the circumstances, and should encompass plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest. <u>See</u> <u>Illinois v. Gates</u>, 462 U.S 213, 230, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1982); <u>Stansbury v. Wertman</u>, 721 F.3d 84, 93 (2d Cir. 2013). An officer has probable cause to arrest or detain "'when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" <u>Garcia v. Does</u>, 779 F.3d 84, 92 (2d Cir. 2015) (quoting <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 751 (2d Cir. 2010)). In assessing probable cause, an officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." <u>Ricciuti v. New York Transit Auth.</u>, 124 F.3d 123, 128 (2d Cir. 1997).

When a victim or eyewitness reports a crime, probable cause will generally be found to exist, unless the circumstances raise doubt as to the veracity of the complaint. <u>See</u> <u>Panetta v. Crowley</u>, 460 F.3d 388, 395 (2d Cir. 2006). The victim or witness must be credible, and can only be relied upon "absent circumstances that raise doubts as to the victim's veracity." <u>Singer</u>, 63 F.3d at 119. "The most common situation in which such doubt arises is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." <u>Mistretta v. Prokesch</u>, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998). "When such a relationship exists, and is known to the arresting officer before the arrest is made, the complaint alone may not constitute

probable cause; the officer may need to investigate further."   Id.

To determine whether probable cause existed for an arrest, courts "assess whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."   Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006). It is the plaintiff's burden to establish the absence of probable cause, and whether probable cause existed may be decided as a matter of law, unless the pertinent facts and knowledge of the officer are disputed.   See Nickey v. City of New York, No. 11-CV-3207, 2013 WL 5447510, at *5 (E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the [c]ourt.").

Finally, for purposes of a false arrest/false imprisonment claim, "it is irrelevant if ultimately the plaintiff is acquitted of the charges against him because the inquiry is whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest the plaintiff."   Forsythe v. City of Watertown, 5:17-CV-1132 (FJS/TWD), 2020 WL 1274270, at *6 (N.D.N.Y. Mar. 17, 2020) (quotation marks and citations omitted).

Officer DeVincentis arrested DeSantis for endangering the welfare of a child in violation of New York Penal Law § 260.10 (1).   Under that section, a person is guilty of endangering the welfare of a child when "[h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health."   N.Y. Penal L. § 260.10 (1).

23

In this Court's view, the facts pertinent to the probable cause determination are undisputed and compel the conclusion that Officer DeVincentis had sufficient probable cause to arrest DeSantis under § 260.10 (1).   See Nickey, 2013 WL 5447510, at *5 (holding that existence of probable cause is a question of law when facts are not disputed).   Officer DeVincentis knew that DeSantis had been unreachable for more than 30 minutes and that he had a 5-year-old child in his care.   Upon entering the apartment, Officer DeVincentis observed garbage and open containers of alcohol strewn about the residence.   He also observed DeSantis unconscious on the couch.   DeSantis was unresponsive to initial efforts to rouse him and gained consciousness only after vigorous efforts were employed.   An on-scene toxicology test revealed that DeSantis was heavily intoxicated, so much so that he did not hear or react to M.D.'s extraction from his apartment or know how long M.D. had been gone.   DeSantis could hardly stand and was in no condition to care for a child.   Based on the totality of these undisputed facts, this Court finds that Officer DeVincentis had sufficient probable cause to arrest DeSantis on the charge of endangering the welfare of a child.   Officer DeVincentis is therefore entitled to summary judgment.   See Ackerson, 702 F.3d at 19.

But even if probable cause could be found to be lacking, Officer DeVincentis would still be entitled to summary judgment based on qualified immunity.   As set out above, "[q]ualified immunity protects public officials from civil liability 'if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'"   Coggins, 776 F.3d at 114.

Here, there is no doubt that the right to be free from seizure without probable cause

was clearly established at the time Officer DeVincentis took DeSantis into custody. See Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (collecting cases). The entitlement to qualified immunity therefore turns on whether Officer DeVincentis's probable-cause determination was objectively reasonable. In this regard, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" Jenkins v. City of New York, 478 F.3d 76, 86 (2d Cir. 2007) (quoting Lennon v. Miller, 66 F.3d 416, 423-24 (2d Cir. 1995)). The essential inquiry is whether it was objectively reasonable for the officer to conclude that probable cause existed. See id. Based on the totality of undisputed circumstances set forth above, this standard is easily met. Consequently, Officer DeVincentis would be entitled to summary judgment on this basis as well.

**C. The Culps' Motion for Summary Judgment**

DeSantis's only claim against the Culps is that they conspired with Officer DeVincentis to unlawfully enter his residence and to prosecute him in violation of his Fourth Amendment rights. (Complaint, Docket No. 1, ¶¶ 1, 8, 22-34.) The Culps argue that they are entitled to summary judgment because DeSantis has submitted insufficient evidence that they conspired with Officer DeVincentis in any way. This Court agrees.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors *or between a state actor and a private entity*; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (emphasis

added). "The plaintiff must show that the defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds to violate [the] plaintiff's constitutional or statutory rights." Garcia v. Hebert, Case No. 3:08CV95(DFM), 2014 WL 1316096, at *2 (D. Conn. Mar. 28, 2014).

For a civil conspiracy claim to survive summary judgment, the plaintiff's evidence "must, at least, reasonably lead to the inference that [the defendant's] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 352 (W.D.N.Y. 2015); see also Phoenix v. Reddish, 175 F. Supp. 2d 215, 218 (D. Conn. 2001). In the absence of any evidence of an agreement, summary judgment is warranted. See Ivery v. Baldauf, 284 F. Supp. 3d 426, 440 (W.D.N.Y. 2018) (quoting Ostensen v. Suffolk Cty., 236 F. App'x. 651, 653 (2d Cir. 2007)). Notably, "[t]he mere fact that the individual defendants were all present at the time of the alleged constitutional violations is insufficient to support a conspiracy claim." Id.

Here, DeSantis's claim fails because there is insufficient evidence from which a reasonable factfinder could conclude that the Culps and Officer DeVincentis agreed to violate his constitutional rights. DeSantis alleges that the Culps conspired with Officer DeVincentis to unlawfully enter his apartment and to prosecute him on a baseless charge. But the record is devoid of any "meeting of the minds" in this regard. See Garcia, 2014 WL 1316096, at *2.

DeSantis first maintains that there is circumstantial evidence of the alleged agreement. See Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994) (noting that a civil

conspiracy claim may be proved by circumstantial evidence).    But he fails to identify any

of the circumstantial evidence that he alludes to beyond the fact that the Culps and Officer

DeVincentis were together at the scene and may have spoken to one another.    This is

not circumstantial evidence of an agreement to violated one's constitutional rights; it is

speculation.    See Gustafson, 106 F. Supp. 3d at 352 (noting that mere presence at the

time of an alleged constitutional violation is insufficient to support a conspiracy claim);

Warr v. Liberatore, 270 F. Supp. 3d 637, 650 (W.D.N.Y. 2017) (rejecting proximity

evidence as evidence of an agreement and concluding that findings based on such

evidence would be "pure speculation").

The direct evidence that DeSantis relies on is similarly inadequate.    He first cites

his own testimony that he saw Croce and Lee Culp in his apartment with Officer

DeVincentis.    (DeSantis Dep., Docket No. 21-6, p. 56.)    But this Court fails to fathom

how this observation, even if credited, is evidence of an agreement to act in concert to

inflict an unconstitutional injury.    See Pangburn, 200 F.3d at 72.    It is not evidence of an

agreement at all, but again, is simply evidence of proximity.    See Gustafson, 106 F.

Supp. 3d at 352; Warr, 270 F. Supp. 3d at 650 ("The mere fact that the officers were all

present at the time of the alleged constitutional violations is insufficient to support a

conspiracy claim.").

DeSantis next cites testimony that he says Lee Culp gave in the family court

proceeding.    He claims that Lee, referring to the police, testified that he was "let back

into the home so that he could collect evidence."    (Memorandum of Law, Docket No. 28,

p. 7.)    But this quoted testimony is nowhere in the transcript.    Rather, when asked

whether he let himself into DeSantis's apartment, Lee testified, "The police let us in . . . They brought us in." (Family Court Testimony of Lee Culp, p. 180.) When further pressed, Lee stated, "They said, come with us, and we came." (Id. p. 181.) And when specifically asked, "And then [the police] said, hey, why don't you do our work and take some pictures?," Lee answer, "*No*." (Id. (emphasis added).) Thus, Lee's actual testimony is troublingly the direct opposite of what DeSantis represents it to be.

Finally, DeSantis maintains that Andrea Culp's filing of a police report with Officer DeVincentis is evidence from which a jury could find that she conspired with him. Not only is the filing of a police report not evidence of an agreement to act in concert to inflict an unconstitutional injury, but "it has long been held that a private party does not become a willful participant by merely invoking the assistance of the police." White v. City of New York, 17-CV-2404, 2019 WL 1428438, at *5 (S.D.N.Y. Mar. 29, 2019) (quotation marks and citation omitted); cf. Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2d Cir. 1999) ("Where, as here, a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not "jointly engaged" in the officer's conduct so as to render it a state actor under Section 1983.").

It should not be lost that there is no dispute that neither Culp knew Officer DeVincentis and neither had contact with him ever again after the night in question. DeSantis's entire claim is premised on the mere fact that the Culps and Officer DeVincentis were on the scene together and *could have* conspired. (See, e.g. Memorandum of Law, Docket No. 28, p. 5 (arguing that there is a "*possibility* that the

parties had the requisite meeting of the minds when they decided to enter [DeSantis's] residence with one another, thereby violating Plaintiff's rights") (emphasis added). This is woefully insufficient at the summary judgment stage, where the nonmoving party must come forth with evidence from which the jury could find in its favor. Anderson, 477 U.S. at 252; Celotex, 477 U.S. at 322 (holding that the party opposing summary judgment must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial"); see also Gustafson, 106 F. Supp. 3d at 352 (noting that to avoid summary judgment, the plaintiff's evidence of a civil conspiracy "must, at least, reasonably lead to the inference that [the defendant's] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.") Accordingly, in the absence of sufficient evidence from which a reasonable factfinder could conclude that the Culps conspired with Officer DeVincentis to violate DeSantis's constitutional rights, the Culps are entitled to summary judgment. See Ivery, 284 F. Supp. 3d at 440 (granting summary judgment in absence of evidence from which a reasonable factfinder could find a conspiracy); Warr, 270 F. Supp. 3d at 650 (granting summary judgment where plaintiff came forward with no evidence of a conspiracy).

## IV. CONCLUSION

Due to the existence of disputed issues of material fact, a jury must resolve whether Officer DeVincentis entered DeSantis's home on February 16, 2014, in violation of his Fourth Amendment rights. Officer DeVincentis is therefore not entitled to summary judgment on this claim. But Officer DeVincentis is entitled to summary judgment on

DeSantis's unlawful entry, malicious-prosecution, and false arrest/false imprisonment claims. So too, this Court finds that Defendants Andrea and Lee Culp are entitled to summary judgment on DeSantis's § 1983 conspiracy claim, the only claim brought against them. Finally, the other named defendants are entitled to summary judgment as DeSantis concedes that he cannot prove his claims against them. Consequently, Officer DeVincentis's motion for summary judgment will be granted in part and denied in part, and the Culps' motion for summary judgment will be granted in its entirety. Before proceeding to trial, the parties must engage in mediation to determine whether a pretrial resolution of this matter can be reached.

## V. ORDERS

IT HEREBY IS ORDERED, that the Culps' motion for summary judgment (Docket No. 21) is GRANTED.

FURTHER, that Officer DeVincentis's motion for summary judgment (Docket No. 23) is GRANTED in part and DENIED in part, consistent with this decision.

FURTHER, that this case is REFERRED for alternative dispute resolution under Section 2.1.B of the Plan for Alternative Dispute Resolution in the United States District Court for the Western District of New York ("the ADR Plan").

FURTHER, that the parties shall comply with all relevant requirements of the ADR Plan, which is available at http://www.nywd.uscourts.gov.

FURTHER, that within seven days of this decision, the parties shall contact ADR Administrator Amanda G. Williams for direction on how to proceed with mediation under the March 16, 2020 General Order Re: Alternate Dispute Resolution Under

Circumstances Created by COVID-19.

FURTHER, that the parties shall file a joint written notice concerning the status of mediation on June 1, 2020.

SO ORDERED.

Dated:   March 31, 2020
        Buffalo, New York

s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
